UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

TERRENCE BATTLE and MUNIR PUJARA,    :

      Plaintiffs,      :

                      :

  -versus-      :

THE CITY OF NEW YORK; RAYMOND W.    :
KELLY, Commissioner of the New York City    :
Police Department; WENDELYN COSTANZA,    :
PHILIP FACENDA, MICHAEL MILLER,    :
TOMAS REYES, and JEFF TORREDA, members  :
of the New York City Police Department,    :

                      :

      Defendants.      :

-------------------------------------------------------------x



11 Civ. 3599 (RMB)

**FIRST AMENDED COMPLAINT**

ECF Case

## PRELIMINARY STATEMENT

1.    This is a civil rights action seeking to halt a New York City Police Department practice

of detaining, questioning, frisking, and searching law-abiding New Yorkers -- primarily

African-Americans, Latinos, and other non-whites -- who ride in livery cars.  These

innocent New Yorkers are targeted for this aggressive and frightening mistreatment, often

late at night, without any suspicion of wrongdoing.  Rather, the NYPD is using a program

that allows it to stop livery cars to ask the drivers about their well-being and to visually

inspect the cars as a license to remove passengers from the cars and to question, frisk, and

search the passengers and to search their possessions.

2.    Plaintiff Terrence Battle, an African-American radio executive, was riding home in a

Brooklyn livery car late at night in October 2010 when police officers stopped the car.

Even though the driver told the officers there was no problem and even though the

officers had no reason to suspect Mr. Battle of any wrongdoing, they ordered him out of

1

the car and then questioned, frisked, and searched him and his bag. Plaintiff Munir Pujara, an attorney and of South Asian descent, had a similar experience when riding home in a livery car in the Bronx in September 2010. In both instances the officers who questioned, frisked, and searched Mr. Battle and Mr. Pujara stated that this was routine NYPD practice and claimed that each man had consented to this treatment by riding in a livery car that was participating in the livery-car safety program.

3.     Under the NYPD's Taxi/Livery Robbery Inspection Program (TRIP), police officers may pull over livery cars with decals indicating they have enrolled in the program, visually inspect the vehicles, and briefly question drivers. The plaintiffs do not challenge these aspects of the program. Nothing about the program, however, can or does authorize officers to detain, question, frisk, or search passengers without independent suspicion of wrongdoing. Nonetheless, the NYPD has a practice of doing so, with officers apparently believing that driver participation in the program means that passengers consent to this treatment. And because livery cabs operate predominantly in non-white neighborhoods, it is African-Americans, Latinos, and other non-whites who bear the brunt of this unlawful practice, just as is true with the NYPD's notorious practice of stopping and frisking law-abiding pedestrians.

4.     The NYPD's practice of detaining, questioning, frisking, and searching passengers without suspicion under its TRIP program violates the United States and New York Constitutions. Mr. Battle and Mr. Pujara seek a declaration that their treatment was unlawful, a declaration that the NYPD's practice is unlawful, and an injunction against the practice.

PARTIES

5. Plaintiff TERRENCE BATTLE is a resident of New York City.

6. Plaintiff MUNIR PUJARA is a resident of New York City.

7. Defendant THE CITY OF NEW YORK is a municipal corporation within the State of New York.

8. Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department. He is sued in his official capacity.

9a. Defendant PHILIP FACENDA is a member of the NYPD who participated in the encounter with Mr. Battle. He is sued in his official and personal capacities.

9b. Defendant MICHAEL MILLER is a member of the NYPD who participated in the encounter with Mr. Battle. He is sued in his official and personal capacities.

9c. Defendant TOMAS REYES is a member of the NYPD who participated in the encounter with Mr. Battle. He is sued in his official and personal capacities.

9d. Defendant JEFF TORREDA is a member of the NYPD who participated in the encounter with Mr. Pujara. He is sued in his official and personal capacities.

10a. Defendant WENDELYN COSTANZA is a member of the NYPD who participated in the encounter with Mr. Pujara. She is sued in her official and personal capacities.

FACTS

**Terrence Battle**

11. Terrence Battle is a native New Yorker who currently lives in the Bedford-Stuyvesant neighborhood of Brooklyn with his two children. Mr. Battle is African-American and is 38 years old.

12.    Mr. Battle is a manager at prominent New York City radio stations Hot 97 and KISS FM and has worked in the radio business since 1991. He also works as a stand-up comedian performing throughout New York City.

13.    Mr. Battle frequently takes livery cars, especially when his comedy performances end late in the night, because yellow cabs rarely are available in his neighborhood.

14.    On Saturday, October 30, 2010, Mr. Battle returned to Brooklyn after performing in a comedy show in Manhattan. He got off the subway at the Broadway Junction stop in Bedford-Stuyvesant sometime after 3:00 a.m.

15.    Mr. Battle got into a livery car to take him home from the station. He sat in the backseat of the car and placed his bag beside him. He was wearing a jacket, tee shirt, jeans, and a Hot 97 hat.

16.    The livery car turned on to Mr. Battle's street around 3:30 a.m. As the car approached his home, Mr. Battle noticed police lights flashing behind him. Initially unconcerned, he assumed the livery car was being pulled over for a minor reason such as a broken taillight.

17.    The livery driver pulled the car over to the side of the road. Sitting in the rear passenger seat, Mr. Battle saw three men in street clothing step out of the police car. They walked over to the parked livery car and stood by the driver's window. The men wore badges around their necks identifying them as police officers, but their names were not displayed. The officers since have been identified as defendants Philip Facenda, Michael Miller, and Thomas Reyes.

18.    One of the officers asked the driver if everything in the vehicle was alright. The driver said that everything was fine.

19.   The officers, shining their flashlights, looked through the interior of the car.  Mr. Battle
      was still sitting in the rear passenger seat.

20.   One of the officers then ordered Mr. Battle to get out of the car.  Though fearful, Mr.
      Battle cooperated and stepped out of the car.

21.   Mr. Battle stood next to the car door, with his back to the car.  The three officers faced
      him from the street, blocking any movement.

22.   Mr. Battle was alone in the street with the officers in the middle of the night.  Vulnerable
      and exposed to the officers, Mr. Battle felt afraid.  He made sure not to make any sudden
      movements and kept his hands in view.

23.   Mr. Battle thought of incidents where African-Americans were killed or injured by NYPD
      officers without provocation.  Surrounded by three armed police officers, Mr. Battle was
      in extreme fear for his personal safety.

24.   One of the of the officers demanded identification from Mr. Battle.  Mr. Battle gave the
      officer his driver's license.

25.   The police officers then searched Mr. Battle.  He was patted down, and his jacket pockets
      were searched.  Mr. Battle did not consent to this.

26.   Mr. Battle's bag, which he had placed on the ground next to him, was searched by one of
      the officers.  Mr. Battle did not consent to this.

27.   As he was being patted down, Mr. Battle asked the police officers why they were
      searching him.  One officer said that it was routine.  He pointed to a TRIP decal on the
      car, which Mr. Battle had not previously noticed, and told Mr. Battle they were allowed to
      search him under TRIP.

28.   After searching Mr. Battle and his bag, the officers told him they were done with him.

29.   Though free to go, Mr. Battle told the officers that he was upset at their treatment of him. The officers replied that he had consented to being questioned and searched when he entered a livery car that participated in TRIP. They again stated that their actions were part of a routine stop under TRIP.

30.   The officers explained that these stops and searches were a method of removing weapons and drugs from the street. Referring to the 81st Precinct, where the stop took place, one of the officers asked Mr. Battle, "Do you know how many murders we have in the eight-one?"

31.   The 81st Precinct is known for controversial policing. In recently published recordings of roll calls in the 81st Precinct, officers were routinely pressured to stop and frisk individuals as often as possible, even if unlawfully. During one roll call, a sergeant in the 81st Precinct stated, "Anybody walking around, shake them up, stop them, 250 them, no matter what the explanation is." (The term "250" refers to the form completed by police officers who conduct stops and frisks.)

32.   Aware of this controversy and believing he was the victim of an improper stop, Mr. Battle requested the names of the police officers. They gave their names as Officer Facenda, Officer Reyes, and Sergeant Miller.

33.   Mr. Battle was not charged with any crime. He had done nothing unlawful or suspicious before or during the encounter. The NYPD officers had no lawful reason to detain, question, frisk, or search him.

34.   After being detained and searched by the police officers, Mr. Battle felt fearful, powerless, and indignant. He knew that the officers mistreated him and had no right to do what they had done to him.

35. The following Monday, November 1, Mr. Battle filed complaints with the NYPD's Internal Affairs Bureau and the New York City Civilian Complaint Review Board. Mr. Battle attended an interview with the Civilian Complaint Review Board on November 23, 2010.

36. On January 21, 2011, Mr. Battle filed a timely Notice of Claim.

37. At all times during the encounter with Mr. Battle, the police officers were acting under color of law.

38. Because he often has no other choice, Mr. Battle continues to use livery cabs at night. He is anxious, however, when he is in a livery car because he fears that he may have another similar encounter with police officers.

**Munir Pujara**

39. Munir Pujara lives in Harlem. He is of South Asian descent and is 37 years old.

40. Mr. Pujara is an attorney and works for Part of the Solution (POTS), a social service organization located in the northwest Bronx.

41. Mr. Pujara regularly takes livery cars to travel between his Bronx office, the Bronx courthouse, and his home in Harlem. Like Mr. Battle, Mr. Pujara often takes livery cars to return home from work late at night. He does this because yellow cabs are generally not available and because he has at times tried to avoid the subway after having been stopped repeatedly at NYPD subway bag-search checkpoints because, he believes, of his ethnicity.

42. At approximately 11:30 p.m. on Friday, September 3, 2010, Mr. Pujara left work in the Bronx to return home and got into a livery car. After traveling only a short distance, the car was pulled over by a police car. Two officers stepped out of the vehicle.

43.   A female officer, later identified as defendant Wendelyn Costanza, walked over to the passenger side. Meanwhile, a male officer, later identified as defendant Jeff Torreda, approached the driver of the car.

44.   Officer Torreda asked the driver if everything was alright. The driver responded that everything was fine.

45.   Officer Torreda then joined Officer Costanza at the passenger side of the car. One of the officers opened Mr. Pujara's door and told him to get out of the car.

46.   Mr. Pujara was surprised at the officer's command. Mr. Pujara asked the officers if they had any suspicion or cause to ask him to leave the car. They said they did not. He then asked what would happen if he did not leave the car. The officers told him he would be arrested.

47.   Mr. Pujara stepped out of the car. He noticed that the Officer Torreda's hand was on his gun.

48.   The officers told Mr. Pujara to turn around, place his hands on the roof of the car, and spread his legs. Mr. Pujara told the officers that they were not allowed to search him without his consent. Officer Torreda replied that he could.

49.   Troubled by this exchange, Mr. Pujara repeated that the officers had no legal basis for searching him. Officer Torreda insisted that he did because of "the program," referring to TRIP.

50.   Mr. Pujara was familiar with TRIP because he had previously defended a client in the context of a vehicle passenger search. He correctly told Officer Torreda that TRIP allowed them to stop the car only under some circumstances and that he could not be

searched as a passenger without suspicion.  The officer continued to disagree.  He pointed to the TRIP decal on the livery car and said "it shows it right there."

51.  Officer Torreda suddenly pushed Mr. Pujara and frisked his waist area and patted down and searched the front and back pockets of his pants.  Mr. Pujara had not consented to be searched.

52.  After the frisk, Mr. Pujara continued to dispute the legality of the police officers' actions.

53.  Officer Torreda stated that police officers were doing these stop-and-frisks of livery passengers and that it was part of "the program."  Officer Torreda said that officers would continue frisking passengers during TRIP stops, saying, in substance, "We'll be doing them more often."

54.  Finally, Mr. Pujara was allowed to walk away from the car, though the officers did not expressly consent to it and he was fearful as he stepped away from them.  As Mr. Pujara was leaving the scene, the livery car began to drive away.  Mr. Pujara stopped the car and paid the driver ten dollars.

55.  The officers did not find anything illegal on Mr. Pujara or charge him with any crime.  At no point before or during the encounter with the police officers did Mr. Pujara do anything unlawful or suspicious, and the NYPD officers had no lawful basis to detain, question, or frisk him.

56.  At all times during the encounter with Mr. Pujara, the police officers were acting under color of law.

57.  Mr. Pujara filed a complaint with the New York City Civilian Complaint Review Board about his encounter.

58.  On November 23, 2010, Mr. Pujara filed a timely Notice of Claim.

59. Because he has little choice, Mr. Pujura continues to use livery cars, but he is anxious when riding in them out of fear that he will have another similar encounter with the police. For a while after the September incident, Mr. Pujura made an effort to avoid liveries with TRIP decals, but he abandoned this when livery drivers in cars without decals told him that they too were being stopped for driver safety checks.

## Taxi/Livery Robbery Inspection Program

60. The Taxi/Livery Robbery Inspection Program (TRIP) was created by the NYPD in 1994. Upon information and belief, a large number of livery cars enrolled in the program.

61. In 2009 the NYPD initiated Operation Safe Cab, which led to the enrollment in TRIP of hundreds of additional livery cars. On information and belief, virtually all of the vehicles enrolled in TRIP are livery cars.

62. Livery cars are the main form of for-hire passenger car service in minority-populated neighborhoods in New York City. According to the Taxi & Limousine Commission, 97% of yellow taxi pickups are in Manhattan or at airports.

63. Drivers participating in TRIP affix a decal to their cars stating, "This vehicle may be stopped and visually inspected by the police at any time to ensure driver's safety." An NYPD operations order about TRIP provides that passengers may not be removed from vehicles absent independent factors causing the officers conducting the stop to fear for their safety. The operations order further states that passengers may not be frisked during stops absent reasonable suspicion of the existence of violent criminal activity or the possession of a weapon.

64. Nonetheless, the NYPD has a pattern and practice or custom of detaining, questioning, frisking, and searching passengers in livery cars that participate in TRIP without any suspicion of unlawful conduct by the passenger.

65. NYPD officers stated to both Mr. Battle and Mr. Pujara that it was routine to detain, question, and search or frisk passengers riding in vehicles enrolled in TRIP. In both cases, the officers explicitly stated that they were authorized to search or frisk passengers merely because they were riding in a vehicle enrolled in TRIP. When their authority was questioned, the police officers brought the TRIP decal to the attention of the plaintiffs. Both sets of officers also described their actions as part of a larger crime-fighting strategy. Officer Torreda told Mr. Pujara that stop-and-frisks of livery passengers were occurring and would continue to occur.

66. Livery drivers of vehicles enrolled in the TRIP program report that police officers pull over their cars and detain, question, frisk, and search passengers, even after the drivers inform the police officers that there is nothing wrong in the car.

67. The detention, questioning, frisking, and searching of law-abiding passengers in livery cars under the TRIP program closely resembles the treatment of pedestrians under the NYPD's program of aggressively stopping and frisking pedestrians. Since 2003 there have been over 4 million such stops, with nearly 90% of those stopped being entirely innocent. That program is also racially skewed, with over 80% of the stops being of African-Americans and Latinos and only 10% being of whites.

68. As evidenced by the statements and actions of the officers the plaintiffs encountered and by the reports of livery cab drivers and others, the NYPD has failed to adequately train and supervise officers conducting stops under the TRIP program to ensure that they are

not violating the constitutional rights of passengers for whom no independent suspicion exists.  The NYPD Patrol Guide, which contains policies and procedures for NYPD officers, contains no guidelines governing the actions of officers conducting stops under TRIP.

## JURISDICTION AND VENUE

69.    This Court has subject-matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C §§ 1331 and 1343(a)(3)-(4).

70.    This Court has supplemental jurisdiction over all state constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

71.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) in that Defendant City of New York is located within the Southern District of New York.

## JURY DEMAND

72.    The plaintiffs demand a trial by jury in this action on each and every one of their claims.

## FIRST CAUSE OF ACTION

73.    The defendants' actions violated Terrence Battle's rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

74.    The defendants' actions violated Munir Pujara's rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

75.   The defendants' actions violated Terrence Battle's rights under section 12 of Article I of

the New York State Constitution.

### FOURTH CAUSE OF ACTION

76.   The defendants' actions violated Munir Pujara's rights under section 12 of Article I of the

New York State Constitution.

### FIFTH CAUSE OF ACTION

77.   The defendants' actions violated Terrence Battle's rights under the common law of the

State of New York to be free from false arrest, assault, and battery.

### SIXTH CAUSE OF ACTION

78.   The defendants' actions violated Munir Pujara's rights under the common law of the State

of New York to be free from false arrest, assault, and battery.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(1) Assume jurisdiction over this matter;

(2) Declare that the defendants' actions have violated and do violate the Fourth and
Fourteenth Amendments of the United States Constitution, the Constitution of the State
of New York, and the common law of New York;

(3) Enjoin the City of New York and its employees from detaining, questioning, frisking
and/or searching passengers in vehicles enrolled in TRIP in the absence of independent
information about the passenger's conduct that would authorize any such action and order
any and all relief necessary and appropriate to implement this injunction;

(4) Award compensatory damages;

13

(5) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(6) Grant any other relief the Court deems appropriate.

Respectfully Submitted,

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y.  10004
(212) 607-3300

Counsel for the Plaintiffs

Dated:   July 21, 2011
         New York, N.Y.


On the Complaint:
LISA BRAFF
EVAN PARZYCH
New York University School of Law, Civil Rights Clinic